ORDERED.

Dated:  September 07, 2023

_____
Lori V. Vaughan
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| J.E.L. Site Development, Inc. | ) | Case No. 6:19-bk-05398-LVV |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| Gene T Chambers, Trustee | ) | |
| | ) | Case No. 6:22-ap-00005-LVV |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Lennar Homes, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION ON**
**MOTIONS FOR SUMMARY JUDGMENT**

Lennar Homes, LLC ("Lennar") is a national home builder.[1] J.E.L. Site Development, Inc., ("Debtor") was a construction site preparation company.[2] In 2018, Lennar and Debtor executed a contract for utilities ("Utilities Contract") and a contract for earthwork ("Earthwork

---

[1] Doc. No. 1, Complaint ¶ 9; Doc. No. 15, Answer ¶ 9.
[2] *In re J.E.L. Site Development, Inc.*, No. 6:19-bk-05398-LVV (Bankr. M.D. Fla. filed Aug. 16, 2019)("Main Case") at Main Case Doc. No. 9.

1

Contract") (collectively "Contracts") under which the Debtor agreed to furnish all labor, materials, technical and professional services, supervision, tools, equipment, insurance and taxes necessary to complete work on a residential development known as Lake Hammock ("Lake Hammock Project") in Polk County, Florida.[3]

On August 16, 2019, before completing work on the Lake Hammock Project, Debtor filed a voluntary petition for Chapter 11 bankruptcy.[4] David Willis Esq., entered an appearance in the bankruptcy case on behalf of Lennar, and on October 7, 2019, filed a Motion to Compel Assumption or Rejection of Executory Contracts or, in the Alternative, for Relief from the Automatic Stay ("Motion to Assume").[5] Also on October 7, 2019, Jimmy Parrish ("Parrish") of Baker Hostetler filed a Notice of Appearance on behalf of HGR Construction ("HGR"), one of Debtor's largest creditors.[6] A week later, Rosemary Hayes filed a Notice of Appearance as Additional Counsel for HGR.[7]

On October 30, 2019, the Court conducted a preliminary hearing on Lennar's Motion to Assume.[8] The Court's proceeding memorandum from the hearing stated that, "Parties have reached an interim agreement; Order by Willis/Hayes."[9] Based on the parties' interim agreement, on November 14, 2019, the Court entered a Consent Order on the Motion to Assume ("Joint Check Order").[10] In brief, the Joint Check Order authorized Lennar to "make payments by joint check" as provided in the Contracts "in satisfaction of the claims of lien holders only that have recorded liens on the subject real property for labor, services, equipment, or materials

---

[3] Doc. No. 1, Complaint ¶ 11; Doc. No. 28, p.5.
[4] Doc. No. 1, Complaint ¶ 11.
[5] Doc. No. 1, Complaint ¶ 13; Doc. No. 25 Willis Affidavit ¶ 5, ¶8.
[6] Main Case Doc. No. 101; Main Case Claim No. 29-2.
[7] Main Case Doc. No. 116. Rosemary Hayes represents the Chapter 7 Trustee in this adversary proceeding.
[8] Main Case Doc. No. 134.
[9] Main Case Doc. No. 134.
[10] Main Case Doc. No. 143.

acquired or used by the Debtor for the work performed pursuant to/in furtherance of" the Contracts.[11]  Further, Debtor and Lennar agreed to defer assumption or rejection of the Contracts under the Joint Check Order.[12]

Debtor continued to work on the Lake Hammock Project under the Contracts after the bankruptcy filing.[13]  On July 12, 2020, Debtor's Chapter 11 case was converted to a Chapter 7 case and Gene T. Chambers was appointed as Chapter 7 Trustee ("Trustee").[14]  Debtor never assumed the Contracts.[15]

In 2021, Rosemary Hayes, counsel for HGR, was employed as special counsel to the Trustee.[16]  Thereafter, on January 11, 2022, Trustee commenced this adversary proceeding on behalf of the Debtor by filing a complaint against Lennar, alleging two counts: (1) breach of contract, and; (2) unjust enrichment ("Complaint").[17]  In response, Lennar filed a Motion to Dismiss, which was subsequently denied, and then filed an Answer.[18]  On December 19, 2022 both Trustee and Lennar filed motions for summary judgment.[19]  The parties filed responses and replies therewith.[20]

In her Motion for Summary Judgment ("Trustee MSJ"), Trustee argues that there is no issue of material fact that Lennar breached the contracts with Debtor by: (a) failing to pay Debtor over $700,000 owed under the Contracts; (b) paying non-lienor subcontractors/vendors ("subs")

---

[11] Main Case Doc. No. 143.
[12] Doc. No. 1, Complaint ¶¶ 15, 24; Main Case Doc. No. 143.
[13] Doc. No. 1, Complaint ¶ 26; Doc. No. 27, McDonald Aff. ¶¶ 21, 23. Lennar filed a corrected version of the McDonald Affidavit ("Corrected Affidavit") (Doc. No. 73).  Paragraphs 21 and 23 of both the original and Corrected Affidavit are identical.
[14] Doc. No. 1, Complaint ¶ 2; Main Case Doc. No. 361.
[15] Doc. No. 25, Willis Affidavit ¶ 25; *See also* Main Case Docket.
[16] Main Case Doc. No. 416.
[17] Doc. No. 1.
[18] Doc. Nos. 6, 12, 15.
[19] Doc. Nos. 28, 29.
[20] Doc. Nos. 32, 41, 42, 43.

by joint check in violation of the Joint Check Order, and; (c) mishandling change orders.[21] Conversely, Lennar's Motion for Summary Judgment ("Lennar MSJ"), disputes each allegation of Trustee's claim for breach of contract, and further asserts that Trustee's claim for unjust enrichment fails as a matter of law.[22] After reviewing the record and considering the parties' arguments, the Court agrees with Lennar and grants summary judgment in its favor.

## Summary Judgment Standard

"Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*, 328 F. Supp. 2d 1319, 1329 (S.D. Fla. 2004).[23] In reviewing a motion for summary judgment, the court's focus is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. (quoting *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). The movant has the burden to demonstrate the absence of a genuine issue as to any material fact. *Id*. (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Tyson Foods, Inc.,* 121 F.3d at 646.). Once movant establishes the absence of a genuine issue of material fact, it is up to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

---

[21] Doc. No. 29. The Trustee MSJ also includes a non-descriptive paragraph alleging generally that Lennar's affirmative defenses should be stricken as they are "impertinent." Because Trustee does not substantively address Lennar's affirmative defenses and because the Trustee MSJ is being denied, the Court will not address the matter here.
[22] Doc. No. 28.
[23] Rule 56 is applicable under Federal Rule of Bankruptcy Procedure 7056.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Evans v. Birmingham Hide & Tallow Co. Inc.*, No. 22-10912, 2023 WL 3198240 at *2 (11th Cir. May 2, 2023).

## I. Trustee's Breach of Contract Claim

"To state a claim for breach of contract under Florida law, a plaintiff must show '(1) a valid contract; (2) a material breach; and (3) damages.'" *Southshore Hosp. Mgmt., LLC v. Indep. Specialty Ins. Co., Inc.*, 582 F. Supp. 3d 1222, 1226 (M.D. Fla. 2022) (quoting *Abbott Lab'ys, Inc. v. Gen. Elec. Cap.*, 765 So. 2d 737, 740 (Fla. 5th DCA 2000)).

### 1. Non-payment

As to her breach of contract claims, Trustee first argues that Debtor substantially completed its work under the Contracts and Lennar breached the Contracts by not paying Debtor.[24] However, Trustee cites to nothing in the record to support her contention that Debtor substantially completed its work under the Contracts and that Lennar failed to pay Debtor.[25] Rather, the undisputed record shows that Debtor did not substantially complete the work on the Lake Hammock Project and that Lennar was forced to expend funds to cover work not performed by Debtor. Lennar relies on an affidavit by Mark McDonald ("McDonald Affidavit"), the Vice President of Land Operations for Lennar, who affirms Debtor did not substantively complete its work and Lennar had to spend in excess of the amounts set out in each contract in

---

[24] Doc. No. 29, Trustee MSJ at 7.

[25] Instead of citing to facts in the record, Trustee relies on Bankruptcy Rule 7009, which incorporates Federal Rule of Civil Procedure 9(c), and argues because Lennar did not deny with particularity in its Answer a condition precedent that Debtor completed its work on the Lake Hammock Project under the Contracts, this fact is deemed admitted. However, Lennar filed its motion for summary judgment before the Trustee and denied with particularity Trustee's claim that Debtor substantially completed its work on the Lake Hammock Project. As a result, this fact is not deemed admitted. *Gottlieb & Gottlieb, P.A. v. Crants*, No. 8:14-CV-895-T-33MAP, 2015 WL 7759462 at *3 (M.D. Fla. Dec. 2, 2015) ("[A] party may deny the occurrence of a condition precedent with particularity in its answer or motion for summary judgment, but not in response to a motion for summary judgment"); *See also Associated Mechanical Contractors, Inc. v. Martin K. Eby Const. Co., Inc.* 271 F.3d 1309, 1317 at *3 (11th Cir. Nov. 9, 2001)("The specific denial of performance of conditions precedent may be raised by motion as well as by answer.")).

order to complete the work.[26] Specifically, the McDonald Affidavit states that the "Debtor abandoned the Project" at a time when "substantial work set out in the Contracts remained to be completed."[27] This included "compensating storage excavation, grading work, sidewalks installation, work on the entrance for Phase 3 of the Project, off-site right turn lane, installing common area sod, surveying, creating as-built drawings and obtaining certificates of completion for Phases 2 and 3 of the Project."[28] Additionally, McDonald's affidavit is supported by his sworn testimony at an October 28, 2021 deposition, stating:

> Q: What were the balances that were left . . . regarding the balance outstanding and retainage that was unpaid from the Lennar contract, and the records regarding any offsets taken against amounts that otherwise would have been paid to J.E.L. on the project[?]
>
> A: [T]he . . . [Utility Contract], after we paid all of the pay apps that paid J.E.L. directly, and then after we paid all the joint checks, we would have had an open balance of around 452,000 of work that had not been completed at that point in time. And then on the [Earthwork Contract], that balance would have been about 335,000. And then those funds—after May of 2020—were used directly to finish the job."[29]

McDonald went onto testify, "I know that this job has cost us far more than the contract values to complete the scope of work."[30]

The cost estimates given in McDonald's deposition testimony are substantially similar to the worksheets included with McDonald's Affidavit,[31] all of which show that Lennar overspent what was budgeted for the Lake Hammock Project in the Contracts, and no money was left owed

---

[26] Doc. Nos. 27, 73, McDonald Aff. ¶¶ 33,34, 36-40. The Corrected Affidavit includes a list of payments due to vendors totaling $102,805.65 (Exhibit F) and revises the amounts of the Total Shortfall/Loss under the Contracts. Nevertheless, both the original and Corrected Affidavit assert Debtor abandoned the Lake Hammock Project and Lennar incurred expenses completing the Contracts.
[27] Doc. Nos. 27, 73, McDonald. Aff. ¶ 25.
[28] Doc. Nos. 27, 73, McDonald Aff. ¶ 25.
[29] Doc. No. 24, 10/28/21 McDonald Tr. 22:14, 23-25; 23: 1-11.
[30] Doc. No. 24, 10/28/21 McDonald Tr. 61:18-20.
[31] This is true both for McDonald's original and the Corrected Affidavit.

to Debtor. Because McDonald's testimony and affidavits[32] demonstrate that Debtor did not finish the Lake Hammock Project and Trustee fails to cite to any facts in the record to show otherwise, the Court finds there to be no issue of material fact that Debtor *did not* substantially complete its work on the Lake Hammock Project.[33] Lennar therefore did not breach the Contracts by withholding amounts under the Contracts, otherwise due to Debtor, to cover the incomplete work. *See* Rule 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."); *Tampa Title Investments, LLC v. Halimi (In re Halimi)*, No. 8:19-ap-00162-RCT, 2021 WL 1784072, at *2 (Bankr. M.D. Fla. Mar. 19, 2021) (the Court is under no obligation to "scour uncited portions of the record in search of evidence that might bolster" the non-movants position.).

---

[32] The Corrected Affidavit is substantially similar to McDonald's original affidavit. The Corrected Affidavit has nominal changes to the calculations of amounts paid by Lennar as direct payments made to subs and payments due and owing to subs pending final invoice. Moreover, the Corrected Affidavit adds voluminous documents to its exhibits which further support Lennar's calculations under the Contracts. Trustee filed a motion to strike the Corrected Affidavit arguing that the filing was untimely. However, pertinent here, Lennar's calculations in both the original and Corrected Affidavit demonstrate that Lennar owes no money to the Debtor under the Contracts. Additionally, in both affidavits, McDonald states that the parties did not agree to modify the Contracts under the Joint Check Order.

[33] Instead of presenting record evidence to challenge the McDonald Affidavit, Trustee attacks the affidavit as "inadmissible hearsay" and as "woefully self-serving testimony to overshadow McDonald's prior sworn testimony on behalf of Lennar and to confuse the issues . . . . ." Trustee also objects to the exhibits appended to McDonald's Affidavit, stating that they are incomplete and unsubstantiated. The Court disagrees. McDonald's Affidavit sufficiently establishes his personal knowledge and use of records of regularly conducted business activity to support the facts in his affidavit. *See* Federal Rule of Evidence 803(6) (business records are admissible and employees who have knowledge of the procedures governing the creation and maintenance of such records can testify as to their contents); *Kapila v. H.J. Heinz Co., (In re Trafford Distrib. Ctr., Inc.)*, 414 B.R. 858, 862 (Bankr. S.D. Fla. 2009) *(quoting Washington Central Railroad Co., Inc. v. National Mediation Board,* 830 F.Supp. 1343, 1353 (E.D.Wash.1993) ("As a matter of law, '[P]ersonal knowledge can come from review of the contents of [business] files and records.'")). Further, the Court finds that the accounting information included in the McDonald Affidavit and its attachments would be admissible evidence. *See Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1156 n.2 (11th Cir. 2021) ("evidence does not have to be authenticated or otherwise presented in an admissible form to be considered at the summary judgment stage, as long as the evidence could ultimately be presented in an admissible form.") (internal quotation marks omitted). Despite complaints, Trustee has not presented an affidavit or declaration under Rule 56(d) to show she cannot present facts essential to her opposition. Insofar that McDonald's Affidavit is self-serving—this may be so, but McDonald's statements, which are pertinent to the issues here, are supported by evidence already in the record, such as: McDonald's sworn testimony; the Willis Affidavit; the parties' conduct; and the business documents attached to the affidavits. *See Crockett v. Saks (In re Saks)*, No. 8:20-bk-07854-CPM, 2022 WL 18273866 at *6 (Bankr. M.D. Fla. Dec. 30, 2022).

### 2. Joint Check Order

Second, Trustee argues that the Joint Check Order modified the Contracts "to ensure that only lienors that had perfected their lien rights would receive joint checks, and all payments would be by joint checks such that the Debtor would have to endorse them."[34] Trustee thus asserts that Lennar breached the Contracts by issuing joint checks to non-lienor creditors. A threshold issue then is whether the Joint Check Order modified the Contracts. Lennar contends that the Joint Check Order did not modify the Contracts, and instead served as a stop gap measure to allow Debtor to cure its prepetition defaults, after which the parties would resume acting under the Contracts' terms.

Under Florida law, "parties to a contract can discharge or modify [a] contract, however made or evidenced, through a subsequent agreement." *St. Joe Corp. v. McIver*, 875 So.2d 375, 381–82 (Fla. 2004).[35] "[A] modification merely replaces some terms of a valid and existing agreement while keeping those not abrogated by the modification in effect." *PB Legacy, Inc. v. American Mariculture, Inc.,* No. 2:17-cv-9FtM-29NPM, 2020 WL 2128495 at *5 (citing *Franz Tractor Co. v. J.I. Case Co.*, 566 So.2d 524, 526 (Fla. 2d DCA 1990)). A contract modification "cannot legally exist absent mutual consent of the parties." *Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*, 328 F. Supp. 2d 1319, 1342 (S.D. Fla. 2004) (citing *Newkirk Construction Corp. v. Gulf County,* 366 So.2d 813, 815 (Fla. 1st DCA 1979) ("Modifications of contracts must be supported by new consideration as well as the consent of both parties.")). In examining the scope of a contract modification, courts have determined that "the proper

---

[34] Doc. No. 1, Complaint ¶ 30.
[35] The Contracts are governed by Florida law. The Contracts are attached to the McDonald Affidavit and state at section 22.9 "[t]his Agreement shall be deemed entered into on the state where the Project or Job Site is located and shall be interpreted and applied in accordance with the laws of the state where the Project or Job Site is located." See Doc. Nos. 27, 73, McDonald Aff. Exh. A, B.

resolution of any inconsistency . . . is best determined by the manner in which the parties actually perform under it[.]" *Bornstein v. Marcus*, 275 So. 3d 636, 640 (Fla. 4th DCA 2019).

Here, it is undisputed that the Contracts permitted Lennar to issue joint checks to non-lienor claimants.[36] Further, the Contracts explicitly state that "[the Contracts] . . . cannot be amended except by written instrument executed by [Lennar] and [Debtor]."[37] Although Trustee claims that the Joint Check Order modified the Contracts, the record indicates that there was no mutual consent or agreement between the parties to do so. From a plain reading of the Joint Check Order, there is no indication that the parties intended for the Joint Check Order to modify or otherwise amend the Contracts. The Joint Check Order states, in relevant part:

> Lennar is authorized to make payments by joint check as provided in the [Contracts], *Nunc Pro Tunc* to August 16, 2019, in satisfaction of the claims of lien holders only that have recorded liens on the subject real property for labor, services, equipment, to materials acquired or used by the Debtor for the work performed pursuant to/in furtherance of the [Contracts].[38]

The Joint Check Order authorized Lennar to issue joint checks to unpaid subs with liens on Lennar's property, as the Contracts had not yet been assumed by the Debtor. But the Joint Check Order does not state that it modifies or amends the Contracts. Moreover, the fact the Joint Check Order was an interim order, only effective until Debtor assumed the Contracts, suggests that the parties were not intending to permanently alter the terms of the original Contracts.

The Court notes that much of Trustee's Complaint is couched in the premise that the Joint Check Order modified the Contracts to prohibit Lennar from issuing joint checks to non-lienors. But Trustee spends almost no time discussing the issue of contract modification in her

---

[36] Specifically, section 12 of the Contracts detail the procedure for paying subs, stating in relative part that "[w]hen [Lennar] learns of *any claim* or dispute, [Lennar] may (i) withhold payments otherwise due Contractor until the claim or dispute is resolved to [Lennar's] satisfaction, (ii) *issue joint checks to [Debtor] and any claimant*, or (iii) deposit any disputed funds into the registry of a court of law" (emphasis added).
[37] Section 22.4 of Contracts. Doc. Nos. 27, 73, McDonald Aff. Exh. A, B.
[38] Main Case Doc. No. 143.

summary judgment papers. Trustee points the Court to *nothing* in the record to show that the parties actually agreed to modify the Contracts by way of the Joint Check Order. *See* Rule 56(c)(1)(B) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . showing that the materials cited do not establish the absence or presence of a genuine dispute").

Lennar cites to the McDonald Affidavit to explain the context surrounding the Joint Check Order. McDonald states that in July 2019 Debtor "defaulted upon various terms of the Contracts. At this time, the Debtor's subcontractors began contacting Lennar seeking payment. Additionally, Lennar became aware that subcontractors of the Debtor had filed liens upon Lennar's property because they had not been paid by the Debtor for work that they performed on the Project."[39] Further, "the Debtor was not performing work on the Project, and the Debtor was not complying with the work schedule for the Project."[40] Therefore, after Debtor filed for bankruptcy, Lennar filed its Motion to Assume but HGR objected to the Debtor's assumption of the Contracts.[41] McDonald explains that, "Lennar, the Debtor and HGR negotiated a resolution of the dispute regarding the Motion to Assume that allowed the Debtor to cure its breaches of the Contracts by permitting payment by joint checks to pay past due amounts owed to subcontractors and suppliers and satisfy liens upon Lennar's property filed by unpaid subcontractors, materialmen, suppliers and labors of the Debtor."[42] McDonald specifically notes in his affidavit that Lennar "did not agree to modify these or any other provisions of the Contracts regarding Lennar's right to issue or withhold payments pursuant to the Contracts."[43]

---

[39] Doc. Nos. 27, 73, McDonald Aff. ¶ 7.
[40] Doc. Nos. 27, 73, McDonald Aff. ¶ 9.
[41] Doc. Nos. 27, 73, McDonald Aff. ¶ 15.
[42] Doc. Nos. 27, 73, McDonald Aff. ¶ 16.
[43] Doc. Nos. 27, 73, McDonald Aff. ¶ 19.

McDonald's understanding of the Joint Check Order is supported by an affidavit created by David Willis, former counsel for Lennar who negotiated the agreement. In his affidavit, Willis states that, in negotiating the Joint Check Order, "the agreement reached by the parties provided that Lennar was permitted to issue joint check payments to those parties who filed liens against Lennar's property to permit the Debtor to cure the Debtor's breach under its contracts with Lennar."[44] Willis explains that "[u]pon satisfying the liens and curing the breaches under the contracts, the Debtor and Lennar would proceed under the contracts and postpone consideration of assumption of the Debtor's contracts with Lennar until confirmation."[45] Confirming this understanding, at the October 30, 2019 preliminary hearing on Lennar's Motion to Assume, Willis told the Court that the interim Joint Check Order, which had yet to be drafted, would allow "Lennar to pay by joint check any liens that are filed currently or any liens that may be filed in the future . . . following that, Lennar has the rights under its contract to issue joint checks."[46] At the same hearing, Parrish agreed with the representations made by Willis and Hayes, who was also present, made no objection to the representations by Willis.[47]

Furthermore, Lennar and Debtor's actions after entry of the Joint Check Order are consistent with the original Contracts, as well as McDonald's and Willis's understanding of the Joint Check Order's purpose. *Capital Factors, Inc. v. Homeline Corp.* (*In re Gen. Plastics Corp.*), 158 B.R. 258, 284 (Bankr. S.D. Fla. 1993) ("terms in a contract may be modified by the subsequent conduct of the parties."). After the prepetition lienors had been paid, Debtor resumed work on the Lake Hammock Project pursuant to the Contracts, even though Debtor had not yet

---

[44] Doc. No. 25, Willis Aff. ¶ 21.
[45] Doc. No. 25, Willis Aff. ¶ 21.
[46] Doc. No. 85, Exh. 1, 10/30/19 Hr'g Tr. 14:15-21. Although the 10/30/19 hearing transcript is attached as Exhibit 1 to Trustee's Response in Opposition to Lennar's Motion to Compel Discovery, the Court may consider other materials in the record under Rule 56(c)(3).
[47] Doc. No. 85, Ex. 1, 10/30/19 Hr'g Tr. 6:23-24; 15:6-12.

assumed the Contracts, and Lennar continued to issue joint checks to non-lienor subs under the Contracts. McDonald admitted as much in his deposition, stating "under [Contracts] we would have paid them through joint check prior to them filing a lien–or recording a lien."[48] More explicitly, McDonald stated that, "For post-petition work, we paid vendors through joint check and direct to subs."[49]

      Trustee points to nothing in the record to dispute Lennar's assertion that the Joint Check Order did not modify the Contracts. The only evidence Trustee cites is the Declaration of Rosemary Hayes, former counsel for HGR and current counsel for the Trustee. In her declaration, Hayes seemingly admits that the Joint Check Order was not intended to modify the Contracts, stating that emails regarding the Joint Check Order between HGR's counsel and Lennar's Counsel were "consistent with negotiations that took place by email, telephone, and meetings in person under Rule 408, where parties with an interest were attempting to reach consensus in *extra-contractual* terms of joint check payments in the form of the Court's Orders" (emphasis added).[50] Ms. Hayes was not Debtor's counsel and the Trustee presents no evidence from the Debtor or its counsel regarding the Joint Check Order.

---

[48] Doc. No. 24, 10/28/21 McDonald Tr. 48:3-6.
[49] Doc. No. 24, 10/28/21 McDonald Tr. 57:9-11.
[50] Doc. No. 26, Hayes Declaration at ¶ 5.

Thus, the McDonald Affidavit, the McDonald deposition transcript, the Willis Affidavit,[51] the attached emails between parties' counsel, the Hayes Declaration and the Joint Check Order itself demonstrate that there was no mutual consent between the parties to modify the Contracts, and that the Joint Check Order was intended as a temporary measure to allow prepetition lienors to be paid by joint check in order to cure Debtor's nonpayment.[52] Trustee points to nothing in the record to controvert this.[53] Accordingly, there is no material issue of fact that the Joint Check Order did not modify the Contracts, and therefore Lennar did not breach the Contracts by issuing joint checks to non-lienor subs. *See Halimi*, 2021 WL 1784072, at *2.

---

[51] Instead of pointing to countervailing facts in the record, Trustee's response argues the Willis Affidavit, specifically the section dealing with the purpose of the Joint Check Order, is improper parol evidence. However, Trustee's argument is a red herring. Under Florida law, the parol evidence rule makes inadmissible "evidence of a prior or contemporaneous oral agreement" which varies or contradicts "the unambiguous language of a valid contract." *Ungerleider v. Gordon*, 214 F.3d 1279, 1282 (11th Cir. 2000). Here, the issue before the Court is whether the subsequent Joint Check Order modified the Contracts. The Willis Affidavit, or at least the portions relied upon by the Court, is not parol evidence because Willis's personal knowledge of the formation of the Joint Check Order goes directly to whether there was an intent to modify the Contracts. The Joint Check Order is silent about modification of the Contracts and the context shows there was no intent to modify the Contracts. Therefore, the only valid contracts before the Court are the original Contracts as written, which Trustee fails to show were modified by the Joint Check Order. Additionally, to the extent Trustee argues the Willis Affidavit is hearsay, the Court relies on Willis's personal knowledge in the affidavit to demonstrate the parties' intent in drafting the Joint Check Order—not Willis's recantations of opposing counsel's statements. However, even if the Court were to rely on Willis's statements regarding Parrish's out of court representations, such statements would still not be hearsay because they are not not offered for the truth of the matter asserted, but rather to show Willis's state of mind in that there was no mutual consent between the parties to modify the Contracts by way of the Joint Check Order.

[52] Insofar Trustee claims that Lennar paid prepetition non-lienor vendors by joint check in violation of the interim Joint Check Order, any such violation still would not amount to a breach of the Contracts because the Joint Check Order did not modify the Contracts. Trustee's Complaint does not include a claim for violations of the Court's order. To this end, for reasons unknown to this Court, Trustee dedicates a sizable portion of her summary judgment filings discussing Lennar's potential automatic stay violations but does not include any applicable count in her Complaint.

[53] It appears that Trustee's assertion in her Complaint and summary judgment filings, stating that "according to records of payments made, Lennar failed to pay Debtor at least $430,802 on the Utilities Contract and $284,555 on the Earthwork Contract," refers to the fact that Lennar paid subs these amounts either directly or by joint check. *See* Doc. No. 29, Trustee MSJ at 8. Trustee essentially claims because Lennar paid subs directly and by joint check in violation of the Contracts, those monies are instead owed to Debtor's estate. This is not evidence of unpaid amounts due under the Contracts.

### 3. Change Orders

Finally, Trustee argues in her Complaint that Lennar's failure to approve Change Orders requested by Debtor amounted to a material breach of the Contracts.[54] Specifically, Trustee asserts that Lennar breached the Contracts because it (1) "double dipped" by issuing deductive change orders that reduced the work to be performed and also credited direct payments it made for the work against the contract balances;[55] (2) announced that no additional change orders would be issued unless Lennar made changes to the project plans; (3) refused to approve change orders, including Change Order #19, which had been pending since July 2019; and (4) issued Change Order #10 for $45,972.96,[56] but failed to increase the amount owed to Debtor under either the Utility Contract or the Earthwork Contract.[57] Trustee's arguments are completely unsupported by the record.

---

[54] Doc. No. 29, Trustee MSJ at 8-9.

[55] As to the proposition that Lennar was double dipping and issuing deductive change orders that reduced the work while crediting direct payments it made to the contract amount, Trustee cites to an email attached to her Complaint that Debtor's principal, Jim Lucas sent Lennar where he discusses Change Order #4. *See* Doc. No. 1, Exh. 6. Aside from briefly quoting the Jim Lucas email, Trustee never substantively discusses Change Order #4 in any of her summary judgment filings. From a plain reading of the Lucas email alone, it cannot be discerned that Lennar breached the Contracts as Jim Lucas merely expresses his concern that Lennar *may* double dip, and then provides suggestions on how to avert this. There is no material fact in the record suggesting Lennar actually did "double dip" in issuing change orders. Moreover, the McDonald Affidavit addresses each of Trustee's accusations regarding deductive change orders and states that all change orders issued were properly accounted and corrected. Doc. Nos. 27, 73, McDonald Aff. ¶¶49-52.

[56] In support, Trustee refers to an unsigned copy of Change Order #10 to show Lennar breached the Contracts by not increasing the Utilities Contract by $45,572.96. However, based on the McDonald Affidavit, Lennar corrected any accounting discrepancy under the Utilities Contract by $45,572.96 after discovering said discrepancy. Trustee does not cite anything else in the record to show Lennar breached the Contracts with respect to Change Order #10. Moreover, what exists in the record regarding Change Order # 10 indicates that the Utilities Contract was increased by $45,572.96. *See* Doc. No. 1, Exh. 11; Doc. Nos. 27, 73 McDonald Aff. ¶¶ 37, 51.

[57] Doc. No. 29, Trustee MSJ at 8-9.

Section 11 of both Contracts titled "EXTRA WORK/CHANGES" states, in relevant part:

NO EXTRA WORK OR CHANGES TO THE WORK SHALL BE PERFORMED BY CONTRACTOR OR PAID FOR BY OWNER UNLESS SUCH EXTRA WORK OR CHANGE TO THE WORK HAS BEEN AUTHORIZED IN WRITING BY OWNER AND AGREED TO BY CONTRACTOR PRIOR TO PERFORMANCE THEREOF. ALL EXTRA WORK OR CHANGE TO THE WORK (EACH, A "CHANGE ORDER") MAY BE REQUESTED BY CONTRACTOR IN WRITING AND SHALL INCLUDE AN ITEMIZATION OF THE REQUESTED CHANGE, TOGETHER WITH THE ESTIMATED COST OF THE CHANGES AND SHALL BE SUBMITTED TO OWNER ("REQUEST FOR CHANGE ORDER"). THE COST CHANGES SHALL INCLUDE ALL LABOR AND EQUIPMENT TO COMPLETE THE WORK AND SHALL BE BILLING RATES, WITH NO FURTHER MARKUPS TO BE ADDED,. . . . FOLLOWING WRITTEN APPROVAL OF REQUEST FOR CHANGE ORDER BY OWNER, OWNER SHALL DELIVER TO CONTRACTOR A CHANGE ORDER IN THE FORM ATTACHED HERETO… IN THE EVENT THAT ADDITIONAL WORK IS UNDERTAKEN BY CONTRACTOR PURSUANT TO AN APPROVED CHANGE ORDER, THE CONTRACTOR RATES AND RENTAL RATES, ATTACHED HERETO…, SHALL PREVAIL.

***

SUCH CHANGE ORDERS SHALL NOT BE EFFECTIVE UNTIL EXECUTED BY THE CONTRACTOR AND OWNER. . . . FAILURE OF CONTRACTOR TO EXECUTE AND RETURN TO OWNER ANY SUCH CHANGE ORDER WITHIN TWENTY-FOUR (24) HOURS AFTER RECEIPT THEREOF SHALL CONSTITUTE CONTRACTOR'S DISAPPROVAL OF SUCH CHANGE ORDER, AND, IN SUCH EVENT, WITHOUT FURTHER WRITTEN NOTICE FROM OWNER, CONTRACTOR SHALL NOT COMMENCE THE WORK SET FORTH IN THE CHANGE ORDER.[58]

Nowhere in the Contracts does it say that the Owner—Lennar—would be in breach of the Contracts if it failed to execute, or did not agree to, a change order request by the Debtor. Still Trustee somehow asserts that Lennar breached the Contracts by not executing change orders where the Contracts are completely silent as to an owner's obligation to do so. Nor does Trustee refer the Court to a section of the Contracts where it might even be construed that Lennar's failure to execute or agree to change orders results in a breach. *See Stafford v. CitiFinancial Corp.*, No. 5:06-CV-1107-VEH, 2007 WL 9711560, at *2 (N.D. Ala. Apr. 24, 2007)

15

("The [Plaintiffs'] breach of contract claim also fails because they are unable to show a breach of any term of the subject loan agreement."). Thus, based on the facts in the record, there is no issue of material fact that Lennar did not breach the Contracts by failing to execute or agree to change orders.

In sum, Trustee fails to show the Court *how* Lennar breached the Contracts.[59] Trustee's Complaint relies on factual allegations completely unsupported by the record. First, Trustee's contention that Debtor substantially completed its work under the Contracts was controverted by the McDonald Affidavit, McDonald's sworn testimony, and the attached business records showing that Lennar had to directly hire subs to complete the work after Debtor dissolved. Second, and most significantly, Trustee's assertion that the Joint Check Order modified the Contracts is controverted by all affidavits filed on summary judgment, the conduct of the parties, and the Joint Check Order itself. Trustee spends almost no time addressing the issue of contract modification and instead makes irrelevant arguments, such as that Lennar violated the automatic stay—a claim not before the Court. Last, as to Trustee's allegations regarding change order requests, the Contracts expressly allow Lennar to not issue change orders. It is entirely unclear which sections of the Contracts Trustee alleges were breached in the first place.[60] Thus, the record, as presented by the parties, demonstrates that no issue of material facts exists that Lennar did not breach the Contracts as alleged in Trustee's Complaint.

---

[58] Section 11 of Contracts. Doc. Nos. 27, 73, McDonald Aff. Exh. A, B.

[59] If Trustee makes additional arguments in her Complaint or summary judgment filings that Lennar breached the Contracts, the Court could not ascertain them. Trustee's allegations and arguments in the Complaint and summary judgment filings are scattered, unclear, and do not properly cite to the law or to the record. *See Barber v. United States (In re Barber)*, 236 B.R. 655, 661 n.2 (Bankr. N.D. Ind. 1998) ("And just as the Court is not required to scour the record looking for factual disputes, it is not required to scour the party's various submissions to piece together appropriate arguments") (internal quotation marks omitted).

## II. Unjust Enrichment Claim

Trustee's claim for unjust enrichment also fails as a matter of law. *Samana Inc. v. Lucena*, 156 F. Supp. 3d 1373, 1374 (S.D. Fla. 2016) (quoting *1021018 Alberta Ltd. v. Netpaying, Inc.,* 2011 WL 1103635, at *5 (M.D.Fla. Mar. 24, 2011) ("'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'"). Lennar asserts that it is entitled to summary judgment as to Trustee's unjust enrichment claim, which is listed as Count II in Trustee's Complaint. Lennar argues that as a matter of law, Trustee's unjust enrichment claim fails because an express contract exists. Trustee does not substantively respond, but rather states in her conclusion that "Trustee's MSJ [should be] granted as regards to . . . unjust enrichment, pled in the alternative if an adequate legal remedy does not exist . . . " However, because it an undisputed fact that both parties were operating under the Contracts, and proper remedies are provided under the Contracts, Trustee's unjust enrichment claim is improper. *See Degutis v. Fin. Freedom, LLC*, 978 F. Supp. 2d 1243, 1265 (M.D. Fla. 2013) ("Unjust enrichment may only be pleaded in the alternative to a breach of contract claim where one of the parties asserts that the contract governing the dispute is invalid.").

Accordingly, it is

**ORDERED**:

1. Lennar's Motion for Summary Judgment (Doc. No. 28) is **GRANTED**.

2. Trustee's Motion for Summary Judgment (Doc. No. 29) is **DENIED**.

3. The Court will issue a separate judgment consistent with this Opinion.

---

[60] Trustee fails to demonstrate a material breach of the Contracts by Lennar. But even if the Trustee did, the question of damages, an essential element of a breach of contract claim, is not substantively discussed by Trustee and precludes summary judgment in Trustee's favor.

###

Attorney Kathleen S McLeroy is directed to serve a copy of this order on interested parties and file a proof of service within 3 days of entry of the order.